2011-01113
FILED
April 15, 2011
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0003424309

BRAD A. MOKRI, SBN: 208213
JENNIFER N. HUPE, SBN: 256009
LAW OFFICES OF MOKRI & ASSOCIATES
1851 E. First Street, Suite 900
Santa Ana, California 92705
Telephone No.: (714) 619-9395
Facsimile No.: (714) 619-9396

Attorney for Plaintiff
HERITAGE PACIFIC FINANCIAL LLC.

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA
## FRESNO DIVISIONAL OFFICE

| | |
|---|---|
| In Re:<br><br>VICTOR M. AND MARIA L. MORENO<br><br>Debtor.<br><br>HERITAGE PACIFIC FINANCIAL, LLC.<br>D/B/A HERITAGE PACIFIC FINANCIAL, a<br>Texas Limited Liability Company,<br><br>Plaintiff,<br>vs.<br><br>VICTOR M. AND MARIA L. MORENO<br><br>Defendant. | Chapter 7<br>Bankruptcy No.: 1:11-bk-11574<br>Adversary Case No.:<br><br>**PLAINTIFF'S COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT**<br><br>[11 U.S.C. §523(a)(2)(A); 11 U.S.C. §523(a)(2)(B)]<br><br>DATE: See Summons |

## COMPLAINT TO DETERMINE THE
## DISCHARGEABILITY OF DEBT AND FOR JUDGMENT

Plaintiff, through its attorney, Brad A. Mokri, of Law Offices of Mokri & Associates, states as follows:

---

PLAINTIFF'S COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

- 1 -

## PARTIES AND JURISDICTION

1. This is an adversary proceeding in bankruptcy brought by Heritage Pacific Financial, LLC. dba Heritage Pacific Financial pursuant to 11 U.S.C. § 523.

2. Defendant filed a Chapter 7 bankruptcy petition on February 11, 2011. Jurisdiction is vested in this proceeding pursuant to 28 U.S.C. § 157, 28 U.S.C. §1334, and 11 U.S.C. § 523; this matter is a core proceeding.

4. Plaintiff is a creditor of defendant. Plaintiff is the assignee and current owner and/or holder of Defendant's loan and related mortgage note.

## GENERAL ALLEGATIONS

5. Plaintiff is informed and believes, and thereon alleges that in an effort to obtain funds to purchase and/or refinance a property, Defendant completed, or caused to have completed on their behalf, a Uniform Residential Loan Application ("Loan Application"), otherwise known as a 1003 Form, which Defendant executed and signed. A true and correct copy of the Uniform Residential Loan Application is attached as **Exhibit "A"** and incorporated by reference herein.

6. Defendant obtained loans evidenced by promissory notes executed by Defendant. Plaintiff is the true and current owner and holder of Defendant's loan and related promissory note. A true and correct copy of the Note is attached as **Exhibit "B"** and incorporated by reference herein.

7. Defendant certified the accuracy of the information contained in the Loan Application and expressly consented to the verification and re-verification of the information contained therein.

8. Among other information required to be certified, and in fact certified, by Defendant on the Loan Application, was information regarding Defendant's current employer, gross monthly income, and intent to use the property securing the loan as Defendant's primary residence.

9. Defendant knew that their then-current income was insufficient to obtain the

loans, and in an effort to secure the more favorable primary-residence financing rate, Plaintiff is informed, believes and thereon alleges that Defendant provided, prepared, or caused to be prepared, a Loan Application which materially misstated Defendant's employment, income and/or intended use of the property as a primary residence; and caused Defendant's agent to submit to the lender a materially false Loan Application and other materially false documents related thereto.

10. Plaintiff is informed, believes, and thereon alleges that Defendant directed, instructed, and caused to have their materially false Loan Application and supporting documentation transmitted to Defendant's lender knowing that the information in the Loan Application and supporting documentation was materially false.

11. The lender did not know, and had no reason to know, that the information and documentation provided by Defendant in and in conjunction with the Loan Application was false. In reliance on the information and documentation provided by Defendant, the lender approved Defendant's Loan Application.

12. Defendant executed a promissory note in favor of the lender, pursuant to which Defendant agreed and promised to repay the loan according to the terms of the promissory note. The proceeds of the loan, as stated in the promissory note, were to be used to purchase and/or refinance the property securing the promissory note.

13. The lender fully performed, including by disbursing the loan proceeds to Defendant. The lender and/or its assignees duly assigned Defendant's loan and promissory note to Plaintiff, who is currently the owner and holder of Defendant's loan and promissory note.

14. Defendant defaulted on their payment obligations and obligation to re-verify the information contained in the Loan Application despite the Plaintiff's request therefore.

15. Plaintiff is informed, believes, and thereon alleges that in applying for the loan, the Defendant knowingly misstated her monthly income on their Loan Application and concealed their true income. Plaintiff is further informed and believes that the Defendant knowingly misstated the status of their employment on the Loan Application and concealed their true employment status. Plaintiff is further informed and believes that Defendant misrepresented their residency such that

the property securing the loan was not Defendant's primary residence, and concealed their true residency status.

16. The promissory note was duly assigned by the original lender and/or its assignees to Plaintiff, who is the current owner and/or holder of Defendant's Loan and related mortgage note.

17. Plaintiff is not barred from pursuing this action by any anti-deficiency statute or rule. Plaintiff does not seek a deficiency judgment for the balance of a promissory note following foreclosure, but rather seeks a judgment for Defendant's fraud in connection with their loan application, as alleged herein. Plaintiff has attempted to resolve this matter prior to filing this complaint by contacting Defendant.

## FIRST CLAIM FOR RELIEF

### False Pretenses, False Representation or Actual Fraud

### [11 U.S.C. § 523(a)(2)(A)]

18. Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 17, above.

19. In an effort to obtain funds to purchase and/or refinance their property, Defendant completed, or caused to have completed on their behalf, a Uniform Residential Loan Application ("Loan Application"), otherwise known as a 1003 Form, which Defendant executed and signed. A true and correct copy of the Uniform Residential Loan Application is attached as **Exhibit "A"** and incorporated by reference herein. Defendant utilized this loan, creating a balance due and owing on this loan of $39,872.00 including interest as of the date the bankruptcy petitioner was filed.

20. Defendant obtained the money by false pretenses, a false representation and actual fraud by misrepresenting that the money obtained for the purpose of purchasing a property for their primary residence. Defendant misrepresented her intended use of the property as their primary residence as the property was being purchased for another individual.

21. The lender did not know, and had no reason to know, that defendant misrepresented their intended use of the property and in reliance on the information approved the loan.

22. At the time of obtaining the money from the lender execution of the loan, Defendant failed to disclose to Lender that they did not and would not use the property as their primary residence. Lender justifiably relied on Defendant's representation and paid money for the purchase of a primary residence.

23. By reason of the foregoing, Defendant obtained money from the lender through false pretenses, false representations and actual fraud. Defendant's actions constitute material misrepresentations of the facts. Defendant intended for the lender to rely on the misrepresentation.

24. Lender reasonably relied upon Defendant's misrepresentations and was induced to lend money to Defendant by those misrepresentations.

25. Within the three years prior to the filing of this Complaint, through its independent investigation and collection attempts, Plaintiff discovered that the representations made on Defendant's Loan Application were false.

26. As a result of Defendant's conduct, Plaintiff has suffered damages at a minimum in the amount of $39,872.00 plus interest and reasonable attorney fees. Pursuant to 11 USC § 523(a)(2)(A), Defendant should not be granted a discharge of this debt to the Plaintiff in the amount of $39,872.00 plus interest and reasonable attorney fees.

## SECOND CLAIM FOR RELIEF
### Use of False Statement in Writing
### [11 U.S.C. § 523(a)(2)(B)]

27. Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 25, above.

28. In an effort to obtain funds to purchase and/or refinance their property, Defendant completed, or caused to have completed on their behalf, a Uniform Residential Loan Application ("Loan Application"), otherwise known as a 1003 Form, which Defendant executed and signed.

A true and correct copy of the Uniform Residential Loan Application is attached as **Exhibit "A"** and incorporated by reference herein. Defendant utilized this loan, creating a balance due and owing on this loan of $39,872.00 including interest as of the date the bankruptcy petitioner was filed.

29. In an effort to obtain the funds, Defendant caused to have completed on their behalf, a Uniform Residential Loan Application, otherwise known as a 1003 Form, which Defendant executed and signed.

30. On the Uniform Residential Loan Application, Defendant certified the accuracy of the information contained therein including but not limited to financial condition of Defendant and consented to the verification and re-verification of the information contained therein.

31. Among the information provided and certified by Defendant in their Uniform Residential Loan Application, Defendant was required to certify information regarding their current employer, statements of their gross monthly income, and to certify that their intended to use the loan proceeds to purchase real property which Defendant intended to use as their primary residence.

32. In furtherance of their effort, because Defendant knew that their then current income was insufficient to support the approval of the loan and/or in an effort to secure the more favorable primary-residence financing rate, Plaintiff is informed, believes and thereon alleges that Defendant:

    a) Provided, prepared, caused to be prepared, false loan applications, which misstated their employment, income and/or intended use of the property as a primary residence;

    b). Certified a false loan application, which misstated their employment income and/or intended use of the property as a primary residence; and

    c). Caused their agents to submit to lenders a false loan application and other loan related documents

33. The lender did not know, and had no reason to know, that the information and documentation provided by Defendant in, and in conjunction with, their loan applications was

false, and in reliance on the information and documentation provided by Defendant to the lender therein approved the loan.

34. Defendant executed a promissory note in favor of their initial lender, its successors, transferees, and assigns. In the loan application Defendant expressly represented to the original lender and to its successor in interest the accuracy of the information.

35. The proceeds of the loan, as referenced in the promissory note, were to be used by Defendant in the purchase or refinance of the property described therein. In exchange, Defendant agreed and promised to pay according to the mutually agreed upon terms and conditions more particularly described in the promissory notes.

36. Lender fully performed, and Defendant acquired title to the property. The promissory note was duly assigned by the original lender and/or its assignees to Plaintiff, who is the current owner and/or holder of Defendant's Loan and related mortgage note.

37. Defendant has defaulted on their obligations to pay and to re-verify the information contained in the Uniform Residential Loan Application. Despite Plaintiff's attempts to secure information from Defendant to re-verify the information contained in their loan application, Defendant has failed and/or refused to comply with Plaintiff's requests.

38. Within the three years prior to the filing of this Complaint, through its independent investigation and collection attempts, Plaintiff discovered that the representations made on Defendant's Loan Application were false.

39. By reason of the foregoing, Defendant obtained money by using a statement in writing that falsely represented Defendant's financial condition on which the lender relied on. Defendant submitted the loan application with the intent to deceive the lender. Defendant, therefore, had a specific intent to defraud their lender.

40. Defendant's actions constitute material misrepresentations of the facts. Defendant intended for their ender to rely on those misrepresentations. Lender did rely upon Defendant's misrepresentations of repayment and was induced to lend money to Defendant by those misrepresentations. Lender reasonably relied on Defendant's misrepresentations.

41. As a result of Defendant's conduct, Plaintiff has suffered damages at a minimum in the amount of $39,872.00 plus interest and reasonable attorney fees. Pursuant to 11 USC § 523(a)(2)(B), Defendant should not be granted a discharge of this debt to the Plaintiff in the amount of $39,872.00 plus interest and reasonable attorney fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court grant the following relief:

1. A monetary judgment against Defendant in the amount of $39,872.00, plus accrued interest at the contractual rate, plus, additional interest at the contractual rate, which will continue to accrue until the date of judgment herein;

2. An order determining that such debt is non-dischargeable under 11 USC § 523(a)(2)(A) and (B);

3. An order awarding Plaintiff its attorneys' fees and costs incurred herein; and

4. An order awarding Plaintiff such additional relief as this Court deems just and equitable.

Dated: April 15, 2011

**Respectfully Submitted,**

**LAW OFFICES OF MOKRI & ASSOCIATES**

By: /S/ BRAD A. MOKRI
Brad A. Mokri
Attorney for Plaintiff
Heritage Pacific Financial, LLC. dba
Heritage Pacific Financial

# GMAC Mortgage
## EquityLine

We want to approve you for the highest possible line amount. The amount you qualify for depends on your ability to repay the equity you have in your home.

The application is easy to complete, just follow the steps outlined below.

For any questions, call: **1-800-888-GMAC.**

Please print clearly.

**New Account Application**

February 16, 2006



FOR INTERNAL USE ONLY:
Producer/Branch Code    71603ST

Amount Requested : $40,000.00

Purpose : Debt Consolidation 0

## 1 Property Information

Complete this section for the property for which the equity line is being considered. Properties must be owner occupied. If you have a first mortgage with a lender other than GMAC Mortgage, attach a copy of your most recent year end mortgage statement.

<u>1999</u>
Year Built

<u>$370,000.00</u>
Purchase Price

<u>765 Warbler Court,</u>
Property Address

<u>Merced</u>
County

<u>Merced</u>
City

<u>12/2004</u>
Month/Year Purchased

<u>$470,000.00</u>
Present Estimated Value

<u>California</u>      <u>95340</u>
State                 ZIP

Type of Property : Single Family

Use of Property : Primary Residence

Name(s) in which Title is held:
VICTOR MORENO, UNMARRIED MAN

Is Title held in a Trust? No

Is there a Land contract? No

Check with your legal advisor and with your other mortgage or deed of trust lienholders as to whether any prior liens contain acceleration clauses which would be activated by a junior encumbrance.

## 2 Applicant Information

Complete This Section For Those Individuals Whose Income Will Be Used To Qualify For The Line Of Credit.

**APPLICANT:**                           Marital Status: Unmarried

**CO-APPLICANT:**                        Marital Status:

<u>Victor Moreno</u>
Full Name of Primary Applicant

<u>██████/64</u>              <u>████-██-7187</u>
Date of Birth              Social Security Number

<u>765 Warbler Court,</u>
Present Address

<u>Merced</u>         <u>California</u>    <u>95340</u>
City            State          ZIP

<u>(209) 384-2317</u>         <u>0</u>
Home Phone              Number of Dependents

<u>City of Merced</u>
Name of Employer

<u>(209) 385-6839</u>         <u>Equ Operator</u>
Work Phone              Position/Title

<u>2.00</u>
Time in Position         (If less than 2 years in position, complete the following)

Previous Employer

Phone                   Position/Title

                        $0.00
Time in Position         Monthly Income

If Self-Employed, check here ☐    (If Self-employed or if you own more than 25% of the business, please fill in the information below)

                        0.00
Name of Business         % of Business you own

Have you any outstanding judgements, or in the last 7 years have you been declared bankrupt?
Applicant ☐ Yes ☑ No    Co-Applicant ☐ Yes ☐ No

Full Name of Primary Applicant

Date of Birth              Social Security Number

Present Address

City            State          ZIP

Home Phone              Number of Dependents

Name of Employer

Work Phone              Position/Title

Time in Position         (If less than 2 years in position, complete the following)

Previous Employer

Phone                   Position/Title

                        $0.00
Time in Position         Monthly Income

If Self-Employed, check here ☐    (If Self-employed or if you own more than 25% of the business, please fill in the information below)

Name of Business         % of Business you own

Have you ever applied for a GMAC Mortgage Home Equity Loan?
If yes, when
Applicant ☐ Yes ☐ No    Co-Applicant ☐ Yes ☐ No



EXHIBIT A

## 3 Financial Summary

Complete this section with the financial information for individuals listed in Section 2. We may require a copy of your W-2 form for last year, a copy of a current pay stub showing year to date earnings, and a copy of your federal income tax returns for the past two years. *Alimony, child support or a separate maintenance income need not be disclosed if you do not wish to have it considered as a basis for repaying the loan. If you wish it to be considered, include a copy of the support order, divorce decree or separation agreement, along with copies of canceled checks showing payments for the past six months. If you are responsible for making alimony, child support or separate maintenance payments, include a copy of the custody award, divorce decree or separation agreement.

**Gross Monthly Income:**

| | | |
|---|---|---|
| Applicant Salary/Wages | $5,146.09 | |
| Bonus/Overtime/Commissions | | |
| Co-Applicant Salary/Wages | $0.00 | |
| Bonus/Overtime/Wages | | |
| | $5,146.09 TOTAL COMPENSATION | |
| Gross Rental Income | $0.00 | |
| (ATTACH COPIES OF ALL LEASE AGREEMENTS) | | |
| *Other Income _____ EXPLAIN | $0.00 | |
| | $5,146.09 TOTAL MONTHLY INCOME | |

**Assets:**

| | |
|---|---|
| Total Cash and Bank Deposits | $0.00 |
| Marketable Securities | $0.00 |
| Other Real Estate | $0.00 |
| | $0.00 TOTAL ASSETS |

**Major Monthly Housing Expenses:**

| | |
|---|---|
| First Mortgage Principal & Interest | $1,572.50 |
| Real Estate Taxes | $133.71 |
| Homeowner's Insurance | $83.00 |
| Homeowner/Condo Association Dues | $0.00 |
| | $1,789.21 TOTAL EXPENSES |

**FIRST MORTGAGE LENDER:**

| CREDITOR | ACCOUNT NUMBER | CURRENT BALANCE |
|---|---|---|
| GMAC Mortgage | 7986 | $296,000.00 |

**CREDIT & OTHER OBLIGATIONS:**

EXCLUDING YOUR FIRST MORTGAGE, ANY DEBTS YOU INTEND TO PAY OFF WITH YOUR GMAC MORTGAGE HOME EQUITY ACCOUNT ARE LISTED BELOW.

Automobile Loan

| CREDITOR | ACCOUNT NUMBER | CURRENT BALANCE |
|---|---|---|
| AMERICAN GENERAL FINANCE | 5603 | $5,876.00 |

Second Mortgage

| CREDITOR | ACCOUNT NUMBER | CURRENT BALANCE |
|---|---|---|
| | | |
| CAPITAL 1 BK | 0524 | $1,735.00 |
| CREDITOR | ACCOUNT NUMBER | CURRENT BALANCE |
| CREDITOR | ACCOUNT NUMBER | CURRENT BALANCE |
| CREDITOR | ACCOUNT NUMBER | CURRENT BALANCE |

Note: Provide additional information as needed on a separate sheet of paper.

## 4 Signature & Certification

By signing this application: The Applicant(s) certify and agree as follows: 1. all statements made in this application are true and are made to obtain the loan requested; 2. the Lender may retain a copy of this application even if the loan is not granted; 3. the Applicant(s) are also entitled to a copy of the application by either making a copy of it or by requesting a copy from the Lender; 4. the Lender or anyone authorized by the Lender may obtain any employment, credit or other information relating to the Applicant(s) for this loan; 5. if the loan is approved, the Lender may obtain additional employment, credit or other information in connection with any update, renewal, extension of the loan, or for the solicitation of loan or insurance products; 6. upon request of any Applicant the Lender will provide the name and address of any credit bureau that issued a consumer report on them; 7. married Applicant(s) may apply for a separate loan; 8. the loan will be secured by a lien against the Applicant(s) home and in the event of a default the Applicant(s) may lose the home; 9. if the loan is approved to sign the documents required by the Lender including an Arbitration Agreement; 10. the Lender may or anyone authorized by Lender may inspect the Applicant's property securing the loan for the purpose of determining its value, and 11.Unless I am obtaining a loan in Vermont or North Dakota, my loan may be reviewed for purchase by the lender's affiliate, GMAC Bank. The lender may share information about me for this purpose only, prior to a loan decision being made. The information shared may include my application and other credit information. If I do not want the lender to share the information with GMAC Bank, I can tell the lender in the comment section below. For Tennessee resident's accounts are provided by GMAC Mortgage Corporation of TN.

Applicant(s) Comments

| Applicant Signature: | Date: | By signing here, it is my desire to apply for Joint Credit Co-Applicant Signature: | Date: |
|---|---|---|---|
| X *Victor Moreno* | December 6, 2005 | X | December 6, 2005 |

**THANK YOU FOR APPLYING FOR A GMAC MORTGAGE HOME EQUITY CREDIT LINE.**

**GMAC Mortgage EquityLine**

A WRITTEN CONFIRMATION WILL BE SENT TO YOU SHORTLY. FOR ANY QUESTIONS, CALL: 1-800-888-GMAC.



EQUAL HOUSING LENDER

Wisconsin Residents: Marital Agreement Notice - No provision of a marital property agreement, unilateral statement under Sec. 796.59 Wis. Stats., or court decree under Sec. 766.70 Wis Stats., will adversely affect our right unless we are furnished a copy of the agreement, statement or decree, or we have actual knowledge of its terms, before credit is granted or the account is opened. Home Equity Credit Loans not offered in Arkansas; Home Equity Credit Lines not offered in: AR, ND, SD, TX & WV; In Tennessee home equity credit lines and loans offered by GMAC Mortgage Corporation of TN.



Account No.: ▆8248 ****
Credit Limit: $40,000.00

# SECONDARY MORTGAGE LOAN

## GMAC MORTGAGE
## HOME EQUITY LINE OF CREDIT
## AGREEMENT AND DISCLOSURE STATEMENT

1. **INTRODUCTION.** In this GMAC Mortgage Home Equity Line of Credit Agreement and Disclosure Statement, as amended and extended, Exhibit A hereto and the Addendum (this "Agreement"), "GMAC" refers to GMAC Mortgage Corporation and for Tennessee residents "GMAC" refers to GMAC Mortgage Corporation of TN. "We", "us", "you," "your" and "our" refer to the person or persons who sign this Agreement as borrower(s).

GMAC will open a Home Equity Line of Credit account (the "Account") for us when we sign this Agreement. A mortgage or deed of trust (collectively the "Mortgage") also must be signed so that advances under the Account will be secured by the mortgaged property (the "Property") identified in the Mortgage. This Agreement and the Mortgage, taken together, are called the "Credit Documents". By signing, we acknowledge that we have read the Credit Documents and we agree to use the Account on the terms set forth below.

We acknowledge that GMAC has provided us with the home equity brochure published by the Federal Reserve Board and a document entitled "Important Terms of your Home Equity Line of Credit Account" (the "Important Terms Disclosure"). Further, we acknowledge that GMAC has fulfilled all of its promises set forth in the Important Terms Disclosure with respect to providing additional information upon our request.

After giving notice of default, GMAC may end our right to advances under the Account, reduce the Credit Limit and/or demand repayment at once of all amounts outstanding under the Account in the circumstances described in paragraph 12(b). GMAC may also halt advances or reduce the Credit Limit, under the circumstances and for the period described in paragraph 12(c).

2. **PROMISE TO PAY.** We promise to pay GMAC all monies advanced under the Credit Documents, including GMAC's out-of-pocket costs shown as Initial Charges on Exhibit A. This amount at any time is called the "Earning Balance Outstanding". We also promise to pay GMAC all FINANCE CHARGES under paragraph 6 and all fees and charges under paragraph 7 ("Special Charges"). This total of accrued Finance Charges and Special Charges at any time is called the "Non-Earning Balance Outstanding". The sum of the Earning Balance Outstanding and the Non-Earning Balance Outstanding is called the "Total Balance Outstanding".

3. **OUR INDIVIDUAL LIABILITY.** GMAC may enforce its rights under this Agreement against any one of us or against all of us.

4. **USING THE ACCOUNT.** The term of this Account will consist of a "Borrowing Period" and a "Repayment Period". During the "Borrowing Period", we may borrow any amounts, up to the Credit Limit shown on the first page of this Agreement. The "Borrowing Period" begins on the "Trigger Date" and ends on the 10th anniversary of the "Agreement Date". The "Repayment Period" begins on the day after the 10th anniversary of the "Agreement Date" and will continue until the 15th anniversary of the "Agreement Date". The "Agreement Date" is date below our signatures on this Agreement or the date the Mortgage was notarized, whichever is later. The "Trigger Date" is the first day after our right to cancel the Account expires.

During the Borrowing Period we may obtain cash advances and goods by presenting Home Equity checks ("Checks") issued to us by a bank or banks selected by GMAC (the "Check Bank(s)"). Each initial and subsequent Check must be written for at least $250 except for the residents of Alabama and Mississippi, where the initial Check must be at least $2000. For residents of Kentucky the initial Check must be at least $15,100. The Check Bank will not cash Checks for us.

Also, GMAC may with its prior approval allow us to obtain from the Check Bank and if the services and/or programs are available: (a) wire transfers; (b) cashier's checks and/or (c) a credit card for the Account which will allow you to obtain: (i) cash advances and (ii) goods and/or services ("Purchases") from participating merchants and ATMS to the extent permitted by law.

We may not borrow from the Account during the Repayment Period.

GMAC is not responsible if anyone refuses to accept a Check, wire transfer, cashier's check and/or credit card from your Account.

Std Draw/Repay



5  NATURE OF THE ACCOUNT.

(a) **AVAILABLE CREDIT DURING THE BORROWING PERIOD.** During the Borrowing Period the Account is a revolving credit line  The maximum amount of credit available to us ("Available Credit") is the Credit Limit less the sum of the amount of all unpaid advances under the Credit Documents and other unpaid fees and charges  Any payment which is applied against the Earning Balance Outstanding increases Available Credit 15 calendar days after the payment is received  There is no Available Credit available to us during the Repayment Period

(b) **ADVANCES.** The Check Bank will notify GMAC daily of any Checks, wire transfers, cashier's checks, cash advances and/or Purchases it has paid and GMAC will promptly pay the Check Bank on our behalf for any of your Checks, wire transfers, cashier's checks, cash advances and/or Purchases that it has paid  However, GMAC may elect either to honor or to refuse to honor (i) any Check, wire transfer or cashier's check which is less than $250, is postdated, improperly completed, presented to the Check Bank more than six months after the Check, wire transfer or cashier's check is dated, or (ii) any Check, wire transfer, cashier's check, cash advance and/or Purchase for an amount which exceeds our Available Credit at the time the Check, wire transfer, cashier's check, cash advance and/or Purchase is presented to the Check Bank (iii) any Check, wire transfer, cashier's check, cash advance and/or Purchase if an Event of Default as defined in Section 12 has occurred, (iv) any Check, wire transfer, cashier's check or cash advance intended to be used in payment of all or part of the amount we owe GMAC on the Account, or (v) any Check, wire transfer, cashier's check, cash advance and/or Purchase which is dated after the Borrowing Period ends

6  FINANCE CHARGES.

(a) **DAILY RATE.** At the end of each day, GMAC will multiply the Earning Balance Outstanding (to get the Earning Balance Outstanding, GMAC takes the beginning balance of the account each day (which includes any Initial Charges 60 days after the Trigger Date, monies previously advanced for Checks, wire transfers, cashier's checks, cash advances and/or Purchases) and adds all monies advanced on that day for Checks, wire transfers, cashier's checks, cash advances and/or Purchases then GMAC subtracts any payments or credits posted as of that day, this gives GMAC the Earnings Balance Outstanding) by a Daily Rate equal to the ANNUAL PERCENTAGE RATE for that day divided by 365 (366 days in a leap year)  The result is the FINANCE CHARGE for that day  The sum of these daily FINANCE CHARGES during a monthly billing cycle is the FINANCE CHARGE for the billing cycle

The ANNUAL PERCENTAGE RATE is based on the value of an index plus a margin and is calculated daily according to the method set forth in the Addendum  The ANNUAL PERCENTAGE RATE is a simple interest rate  The index is the Prime Rate as defined in paragraph 6(c)

In addition, recent Daily Periodic Rates and corresponding ANNUAL PERCENTAGE RATES are shown on the Addendum

(b) **MAXIMUM ANNUAL PERCENTAGE RATE.** <u>Notwithstanding any language in this Agreement to the contrary, the ANNUAL PERCENTAGE RATE will never exceed the Maximum Annual Rate shown on the Addendum</u>

(c) **PRIME RATE.** The Prime Rate for any date (the "Rate Date") is the "prime rate" (or high point of any range of "prime rates") established for the Rate Date by the financial institutions surveyed by <u>The Wall Street Journal</u> in publishing its "Money Rates" (or any replacement) Table  The Prime Rate for the Rate Date will appear in <u>The Wall Street Journal</u> on its first publication date after the Rate Date  If for any reason no such information is published in <u>The Wall Street Journal</u> for the four consecutive days immediately after the Rate Date, and if the <u>New York Times</u> is then publishing a similar table that only includes the "prime rates" of financial institutions surveyed by <u>The Wall Street Journal</u> immediately prior to such time, GMAC will use the appropriate <u>New York Times</u> table until <u>The Wall Street Journal</u> resumes publishing the necessary information  If neither newspaper publishes such information for the four consecutive days immediately after the Rate Date, GMAC will select a substitute index that produces a similar rate, that is publicly available and that is beyond GMAC's control  We understand that a bank's "prime rate" is just a pricing index and is not necessarily the lowest rate charged by a bank

(d) **VARIABLE RATE.** Increases or decreases in the ANNUAL PERCENTAGE RATE and the Daily Rate take effect daily based on changes in the Prime Rate and if provided in the Addendum in the Earning Balance Outstanding  We will not be given any advance notice of changes in these Rates  An increase in these Rates will increase our minimum monthly payment

(e) **WHEN FINANCE CHARGES BEGIN.** FINANCE CHARGES on Initial Charges shown on Exhibit A begin 60 days after the Trigger Date  FINANCE CHARGES on any payment except for checks begin on the date GMAC makes payment  FINANCE CHARGES on a Check begin on the date it is presented to the Check Bank  Except for the Initial Charges, there is no grace period when FINANCE CHARGES do not accrue

(f) **COMPLIANCE WITH RATE LIMITS.** Notwithstanding any other provision of this Agreement, we will not have to pay any FINANCE CHARGES, Initial Charges or Special Charges higher than permitted by law  If it is finally determined that there would be an overcharge, but for this paragraph 6(f), the charge will be reduced to the maximum allowed by law  The amount of any prior overcharge will be used to reduce the Total Balance Outstanding and the remainder will be refunded to us  No credit or refund will cure or waive any default by us

(g) **NATURE OF FINANCE CHARGES.** The ANNUAL PERCENTAGE RATE includes only interest and not other charges

7   **SPECIAL CHARGES.**

(a) **LATE CHARGE.**

(i) If you are a resident of the *District of Columbia, Florida, Indiana, Iowa, Maine, Massachusetts, Michigan, North Carolina, Ohio, Oklahoma, Rhode Island, South Carolina, West Virginia* or *Wyoming* we will not be required to pay a late charge even if your payment is not made by the due date

(ii) If you are a resident of *New York* and GMAC does not receive any month's minimum payment within 15 days after the payment due date we will be required to pay a late charge equal to the lesser of $20 or 2% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge

(iii) If you are a resident *of Idaho, Kansas, Kentucky, Mississippi, Oregon* or *Utah* and GMAC does not receive any month's minimum within 15 days of the payment due date we will be required to pay a late charge equal to the lesser of $20 or 4% of the excess (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge

(iv) If you are a resident of *Wisconsin* and GMAC does not receive any month's minimum payment within 15 days of the payment due date we must pay a late charge equal to $10

(v) If you are a resident of *Alabama, Alaska, Connecticut, Delaware, Maryland, Minnesota, Montana, Nebraska, Nevada, New Mexico, New Hampshire,* or *Vermont* and GMAC does not receive any month's minimum payment by the due date shown on statement for the month we will pay a late charge equal to the lesser of $20 or 5% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge

(vi) If you are a resident of *Arizona, California, Colorado or Georgia* and GMAC does not receive any month's minimum payment within 10 days of the due date shown on the statement for the month we will pay a late charge equal to the lesser of $20 or 5% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge

(vii) If you are a resident of *Tennessee* and GMAC does not receive any month's minimum payment within 5 days of the due date shown on the statement for the month we will pay a late charge equal to the lesser of $20 or 5% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge

(viii) If you are a resident of *Virginia* and GMAC does not receive any month's minimum payment within 7 days of the due date shown on the statement for the month we will pay a late charge equal to the lesser of $20 or 5% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge

(ix) If you are a resident of *Hawaii, Illinois, Missouri, New Jersey, Pennsylvania* or *Washington* and GMAC does not receive any month's minimum payment within 15 days of the payment due date as shown on our statement for that month, we will pay a late charge equal to the lesser of $20 or 5% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge

(x) If you are a resident of *Louisiana* and GMAC does not receive any month's minimum payment within 10 days of the payment due date as shown on the statement for that month, you will be required to pay a late charge equal to the lesser of $15 or 5% of the amount of the delinquent minimum payment due

(xi) If you are a resident of North Dakota and GMAC does not receive any month's minimum payment within 15 days of the due date you will pay a late charge equal to the lesser of $15 00 or 5% of the excess of (i) the unpaid amount of such payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge

(b) **ANNUAL FEE.** If you are a resident of *Hawaii, Kansas, Kentucky, Maine, Maryland, Michigan, Missouri, Montana, New Jersey, New York, North Carolina, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, Virginia, Wyoming, West Virginia* or the *District of Columbia* you will not have to pay an annual fee If you are a resident of a *Illinois* you will pay an annual fee of $ $20 00, b *Iowa* you will pay an annual fee of $15 00, c *Louisiana* you will pay an annual fee of $12 00, d *Florida* you will pay an annual fee of $25 00, e *Ohio* you will pay an annual fee equal to the lesser of $35 00 or ½% of your available credit on the date the annual fee is charged to your account or f if you are resident of any other state your annual fee will be $35 00  The annual fee will be billed on the first anniversary of this Agreement, is non-refundable and constitutes a FINANCE CHARGE

The annual fee will be billed to us each year in the same month this Agreement is signed  GMAC will waive the annual fee if you accrue at least $100 00 of FINANCE CHARGES in the year immediately preceding the date in which the Annual Fee is charged

(c) **HANDLING COSTS.** To the extent permitted by law, we will pay the following fees (i) $25 00 for stopping the payment of any Check that you request to be not paid and (ii) $2 00 for each copy of a Check, sales draft or additional monthly billing statements that we request However, GMAC will not charge handling costs for items requested due to a billing error inquiry

8 **PAYMENTS.**

(a) **MINIMUM PAYMENT EACH MONTH.** During the Borrowing and Repayment Periods we agree to pay at least the amount of the minimum payment shown on each monthly billing statement by the payment due date on the statement To figure the minimum payment during the Borrowing Period for a billing cycle, GMAC will add all FINANCE CHARGES and Special Charges accrued under paragraphs 6 and 7 respectively during the billing cycle and all overdue payments from prior billing cycle The minimum payment is the lesser of the sum of this amount described immediately above or the Total Balance Outstanding at the end of the billing cycle period The minimum payment for a billing cycle during the Repayment Period will be the sum of (i) all FINANCE CHARGES and Special Charges accrued under paragraphs 6 and 7 accrued during the billing cycle, (ii) all overdue payments from prior billing cycles and (iii) the greater of $50 00 or 1 667% of the Earning Balance Outstanding at the end of the Borrowing Period In addition, we will be required to repay GMAC any excess of the Earning Balance Outstanding over our Credit Limit

(b) **PREPAYMENT.** We may prepay the Total Balance Outstanding in full or in part at any time without penalty

(c) **MATURITY DATE.** We understand that making the minimum payment each month during the Borrowing Period will not result in any reduction of the Earning Balance Outstanding Making the minimum payment each month during the Repayment Period will reduce the Earning Balance Outstanding Unless we have paid off the Total Balance Outstanding and canceled the Account or GMAC terminates the Account before the end of the Repayment Period (the "Maturity Date") we will pay the remainder of the Total Balance Outstanding in a single payment which may be a balloon payment See paragraphs 12(b) and 14 The Account will terminate after this final payment

(d) **APPLICATION OF PAYMENTS.** GMAC will apply our payments first against FINANCE CHARGES and Special Charges from prior billing periods, next against advances in prior billing periods, then against FINANCE CHARGES and Special Charges from the current billing period and finally against advances obtained in the current billing period Any Payments for Special Charges will be applied in the following order late charges, if any, annual fees, if any, any handling costs and then to any insurance premiums However, any time the Earning Balance Outstanding is greater than our Credit Limit, GMAC may elect to apply our payments first against advances outstanding, starting with the oldest advance

(e) **STATEMENTS CONCERNING PAYMENTS.** GMAC may ignore statements such as "payment in full" on any check (or which accompany any check) which we send in payment of any amount owed by us GMAC may deposit such check without notifying us and without its deposit being a settlement of the amount owed Any such check will be applied as described in paragraph 8(d)

9 **MONTHLY STATEMENT.** GMAC will send us a statement for each monthly billing period in which we make a payment on the Account or in which the amount due is $1 00 or more

10 **SECURITY.** The Mortgage gives GMAC a lien on the Property to the extent of the Total Balance Outstanding at any time and is made a part of this Agreement by reference The Mortgage describes insurance we must maintain on the Property Although we may choose the insurance company, GMAC has the right to refuse to accept our choice for reasonable cause

11 **TRANSFER OF RIGHTS AND DUTIES.** The Account is our personal obligation, and GMAC is relying on us to repay the amounts it advances We agree not to transfer our credit privileges or our payment duties to another person without GMAC's prior written consent However, GMAC may transfer its rights and duties at any time with or without notice Our heirs, successors and assigns shall be bound by all of our duties, and our approved assigns will have all of our rights GMAC's successors and assigns shall be bound by all of GMAC's duties and will have all of GMAC's rights

12 **EVENTS OF DEFAULT.**

(a) **NOTICE.** The events set forth in paragraphs 12(b) and 12(c) are Events of Default if and when GMAC gives any person (other than GMAC) who has signed a Credit Document ("Signer") notice of default We agree to notify GMAC promptly upon the happening of any event that would be an Event of Default

(b) **TERMINATION EVENTS.** In any of the events described in this paragraph 12(b), GMAC may give notice of default Upon or after giving such notice, GMAC may permanently end our right to advances under the Account, may reduce our Credit Limit and/or, either immediately or at such later time as GMAC elects, may demand repayment at once of the Total Balance Outstanding

4

(i) There has been fraud or material misrepresentation by us in connection with the Account

(ii) We have failed to meet the repayment terms of this Agreement for any amount outstanding, or

(iii) To the extent permitted by law, any action or inaction by you has adversely affected the Property or any right of GMAC in the Property, to the extent permitted by law, this will include, but not be limited to, (or any legal representative or successor of yours) you agreeing to sell, transfer, or assign or selling, transferring or assigning any interest in the Property without the prior written consent of GMAC

(c) **SUSPENSION EVENTS.** In any of the events described in this paragraph 12(c), GMAC may give notice of default GMAC may freeze advances (not permit us to access our Account for additional advances) or reduce the Credit Limit if any of the events described below occur GMAC will notify us if our Account is frozen or if our Credit Limit is reduced If the reason for such action no longer exists and we would like our credit privileges reinstated, then it is our responsibility to deliver to GMAC a written request for reinstatement of credit privileges, with evidence that the event(s) causing the suspension have been cured We promise that we will include with any request for reinstatement any evidence reasonably necessary to show that the event(s) in question have ended If, after reasonable investigation, GMAC agrees that the event(s) resulting in such action no longer exist and that no other conditions that would permit such action currently exist, then GMAC will reinstate our credit privileges

The following events give rise to these consequences

(i) The value of the Property declines significantly below the appraised value of the Property used by GMAC in deciding to open the Account,

(ii) GMAC reasonably believes that we will be unable to fulfill our repayment obligations under the Account because of a material change in our financial circumstances,

(iii) Signers are in default of any of the following obligations under the Credit Documents, which we agree are material

    (A) paragraph 12(c) of the Agreement, requiring evidence of the end of an Event of Default,

    (B) paragraph 16(c) of the Agreement, prohibiting conflicting instructions [or court orders],

    (C) paragraph 16(e) of the Agreement, requiring notice of lost or stolen Checks and/or credit cards,

    (D) paragraph 16(g)(ii) of the Agreement, requiring notice of adverse changes in our credit or financial condition or the value of the Property and requiring compliance with reasonable GMAC requests for information,

    (E) paragraph 16(i) of the Agreement, requiring notice of changes in our address, name or employment and notice of death, imprisonment or incompetency,

    (F) paragraph 3 of the Mortgage, prohibiting prior mortgages, deeds of trust, charges and liens on the Property,

    (G) paragraph 4 of the Mortgage, regarding hazard insurance and condemnation,

    (H) paragraph 5 of the Mortgage, regarding maintenance of the Property,

    (I) paragraph 6 of the Mortgage, regarding protecting GMAC's security,

    (J) if applicable, paragraph 1 of the Condominium Rider or Planned Unit Development Rider to the Mortgage, requiring payment of condominium or planned unit development obligations,

    (K) if applicable, paragraph 2 of the Condominium Rider, regarding notice of a lapse of insurance coverage, or

    (L) if applicable, paragraph 4 of the Condominium Rider or Planned Unit Development Rider, prohibiting certain actions without GMAC's consent,

(iv) The Maximum Annual Percentage Rate provided for in paragraph 6(b) is reached, or

(v) The priority of the Mortgage is adversely affected by government action to the extent that the value of the equity in the Property after liens prior to the Mortgage is less than 120% of the Credit Limit

(vi) GMAC is prevented by any government action from applying to my Account the Annual Percentage Rate that is provided for in this Agreement

(vii) GMAC is notified by its regulatory agency that continued advances would constitute an unsafe and unsound practice

(d) **CURE, ETC.** Notwithstanding any language in this Agreement to the contrary, GMAC will not take any action upon an Event of Default unless permitted by applicable law and GMAC will give us any grace period, right to cure and/or reinstatement right required by applicable law However, we understand and agree that this paragraph 12 is intended to give GMAC all rights permitted by applicable law

(e) **RETURN OF CHECKS AND CREDIT CARDS.** Upon the occurrence of an Event of Default as set forth in Paragraph 12(b), we will promptly return all unused Checks and credit cards to GMAC

(f) **FORECLOSURE.** If we do not repay the Total Balance Outstanding at once when due, GMAC may exercise any right available to it under applicable law, including foreclosure

13 **AMENDMENT OF AGREEMENT.** We agree that GMAC may amend this Agreement, without any further consent from us, if (a) the amendment is "insignificant" (as defined under applicable federal law) or (b) if the amendment will unequivocally benefit us throughout the remainder of the term of this Agreement All other amendments to this Agreement shall require a written agreement between GMAC and us

14 **CANCELLATION BY US.** If we wish to close the Account, we must notify GMAC that we are closing our Account and return all unused Checks and any credit cards The notice must specify the Account number and an effective date of cancellation The date of cancellation must be after GMAC receives the Notice We will be responsible for all Checks signed by us whenever written as well as all credit card cash advances and/or Purchases made by us whenever made, and we will pay GMAC the Total Balance Outstanding on the cancellation date We will not be released from our duties until this amount is paid If GMAC receives a check which satisfies the Total Balance Outstanding GMAC may at its sole discretion consider the Account closed

15 **ARBITRATION.**

I UNDERSTAND AND AGREE THIS AGREEMENT PROVIDES THAT EXCEPT AS DETAILED IN PARAGRAPH 15(b), ALL CLAIMS (AS DEFINED BELOW) WILL BE RESOLVED BY BINDING ARBITRATION BY SIGNING THIS AGREEMENT, THE PARTIES VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT TO LITIGATE THE CLAIM IN COURT, PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OR CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION OR HAVE A JURY TRIAL FOR CLAIMS THAT ARE SUBJECT TO ARBITRATION

(a) **AGREEMENT TO ARBITRATE CLAIMS.** Any claim, dispute, or controversy (collectively "Claim") between GMAC and us (except those listed below in Paragraph 15(b)) including but not limited to those arising out of the Credit Documents, my application, advertisements, servicing and collection of the Account, any outstanding balances or balance transfers posted to the Account, insurance products or services, as well as any other disclosure or document related to the Credit Documents shall exclusively be resolved by **BINDING ARBITRATION** by an arbitrator of the American Arbitration Association ("AAA") in accordance with (i) the Federal Arbitration Act, (ii) the Expedited Procedures of the Commercial Rules of the AAA and the AAA Supplementary Procedures for Consumer Related Disputes and (iii) this Paragraph The term Claim shall be given the broadest possible meaning The terms of this paragraph shall control any inconsistency between the arbitration rules and this Paragraph We may obtain a copy of the arbitration rules by writing the AAA at American Arbitration Association 335 Madison Avenue 10th Floor New York, NY 10017-4605 An action to compel arbitration may be brought at any time even after a Claim has been commenced or raised in a court of law or equity or the Account has been paid in full At your written request GMAC will pay all my fees up to $1,000 for the AAA's cost of the arbitration of the Claim If the cost of the AAA arbitration exceeds $1,000 the parties will share the excess cost equally unless otherwise ordered by the AAA because my costs in pursuing the arbitration would be prohibitive Unless inconsistent with applicable law each party shall pay his/her own attorney, expert and witness fees and expenses

(b) **CLAIMS EXCLUDED FROM JURISDICTION.** The following actions shall not be subject to arbitration any foreclosure action, any action to obtain possession of the property securing the Account, any action for prejudgment injunctive relief or appointment of receiver(s) unless for these actions an arbitrator can provide the relief that a court can provide In addition, GMAC agrees that it will not require us to arbitrate an individual Claim brought against GMAC in small claims court or our state's equivalent court, if any, however, if that Claim is transferred or appealed to a different court, GMAC reserves the right to require arbitration under Paragraph 15

(c) **JUDGMENT and ADDITIONAL TERMS.** An arbitration award shall be final and may be entered as a judgment in any court having jurisdiction, except that if the amount in controversy exceeds $10,000 either party may appeal the arbitrator's award to a three-arbitrator panel of the AAA which shall re-consider de novo any aspect of the initial award The costs of such appeal will be borne by the appealing party The costs of such appeal will be borne by the appealing party regardless of the outcome of the appeal We agree that any arbitration proceeding will only consider our Claims Claims by or on behalf of other borrowers, co-borrowers, co-signers, sureties or applicants will not be arbitrated in any proceeding that is considering our Claim

This Paragraph 15 shall survive any termination of our Account including but not limited to repayments of amounts owed on our Account and an event of default If this loan has been transferred to Fannie Mae or Freddie Mac this section shall be void If any portion of this arbitration provision is deemed invalid or unenforceable, this shall invalidate the remaining portions of the arbitration provision but not the Credit Documents

16 OTHER PROVISIONS.

(a) **WAIVER.** We agree that we will not be released from any of our obligations because GMAC releases or takes any additional security for the repayment of amounts owed GMAC may waive or delay enforcing its rights without limiting its ability to exercise them in the future Any waiver by GMAC shall be in writing and shall apply only to the extent stated in the writing No waiver shall be regarded as a waiver of any other event

(b) **SATISFACTION, COLLECTION AND FORECLOSURE COSTS.** To the extent permitted by law, all satisfaction fees charged by any recording office for canceling the Mortgage will be billed to you, and to the extent permitted by law reasonable out-of-pocket costs (including attorneys' fees) incurred and projected by GMAC in enforcing its rights shall be included as additional indebtedness in any judgment or decree against us

(c) **JOINT ACCOUNTS; CONFLICTING INSTRUCTIONS.** If more than one person signs this Agreement, then this Account is a joint account and each signer will be individually responsible and liable for the entire account balance If this is a joint Account, we agree not to give conflicting instructions regarding the Account Nevertheless, in the absence of a court order, GMAC may comply with a request made by any of us (even if it conflicts with a request made by another one of us) or GMAC may refuse any request GMAC may also give notice of an Event of Default under paragraph 12(c) if it receives conflicting instructions on the Account If GMAC receives conflicting instructions, or a court order regarding the Account, it may refuse any request or dishonor any Check or credit card cash advance or Purchase, without notice to any of us

(d) **STOPPING PAYMENTS.** In order to stop payment on a Check, we must call the telephone number for customer inquiries shown on our most recent monthly billing statement WHILE GMAC WILL MAKE A GOOD FAITH EFFORT TO STOP PAYMENT, GMAC DOES NOT GUARANTEE THAT PAYMENT ON ANY CHECK WILL IN FACT BE STOPPED

(e) **LOST OR STOLEN CHECKS AND/OR CREDIT CARDS.** We agree to contact GMAC immediately at the address or telephone number shown on our most recent monthly statement if we learn that any Check and/or credit card has been lost or stolen

(f) **GOVERNING LAW.** This Agreement will be governed by federal and California law If any provision is invalid, illegal, or unenforceable, this Agreement will be interpreted as if such provision had never been included We agree to fully cooperate in the correction and adjustment of any errors in the loan documents if deemed necessary or desirable by GMAC to comply with any law or regulation or to meet the terms and conditions of the loan approval

(g) **CREDIT INFORMATION.** (i) To the extent permitted by law, GMAC may disclose information about us, our performance under this Agreement, employment, credit, or other information (1) to credit reporting agencies, (2) to affiliates of GMAC unless you (if there is more than one borrower each borrower must notify GMAC to prevent the sharing of that borrower's information with affiliates) notify GMAC at 100 Witmer Road, Horsham, PA 19044-0963 Attention Home Equity Department that GMAC should not share this information with affiliates (upon receipt of this notice GMAC will stop sharing information with affiliates), (3) if GMAC reasonably believes disclosure necessary to ensure our compliance with the Credit Documents, or (4) if we give GMAC our written permission We authorize GMAC to obtain reports from others (such as employers, creditors, lenders and credit reporting agencies) from time to time bearing on our credit status This applies to each of us if this is a joint Account

(ii) We agree to notify GMAC promptly if there is any material adverse change in our credit or financial condition or the value of the Property We also agree to provide GMAC with any updated information GMAC reasonably requests from time to time concerning our credit or financial condition or the value of the Property

(h) **TIME OF THE ESSENCE.** Time is of the essence in this Agreement

(i) **CHANGE OF ADDRESS, ETC.** We will give GMAC prompt prior notice of any change in our address, name or employment and we will give GMAC prompt notice if any of us dies by sending GMAC a certified death certificate if it requests one, is imprisoned or becomes legally incompetent

(j) **NOTICES.** Any GMAC notice shall be hand delivered or sent by first class, registered or certified mail to the address of the Property or such other address specified by the addressee in a written notice given to GMAC Any GMAC notice shall be considered given on the day it is deposited in the U S mail or is hand-delivered

Any notice from us must be mailed to GMAC by first class, registered or certified mail to the address shown on our most recent monthly statement or to such other address specified by GMAC in a written notice given to us Any such notice shall be considered given on the day it is received by GMAC

(k) **FAILURE TO MAKE ADVANCE.** We agree that GMAC will not be responsible if we cannot obtain an advance because of any cause beyond its reasonable control or if anyone refuses to accept a Check, wire transfer, cashier check and/or credit card

(l) **COPIES, ETC.** If GMAC sues to enforce this Agreement, GMAC may use a copy, microfilm, or microfiche of any Check, monthly statement or other document to prove what we owe GMAC The copy, microfilm or microfiche can be used just like the original document

(m) **CREDIT BALANCES.** GMAC will not pay us interest on any credit balances.

(n) **ANNUAL STATEMENT.** Within ten days after receipt of a written request from us, GMAC will deliver to us once per year and without charge a statement showing the date and amount of all payments on the account for the immediately preceding 12 month period, and the Total Balance Outstanding.

(o) **USE OF FUNDS.** We agree to use all funds advanced to us for personal, family or household purposes.

(p) **TAXES.** If taxes on mortgages or the debts they secure increase in any way after the date of the Mortgage, we shall pay the full amount of any such increase.

(q) **TAX ADVICE.** We should consult a tax advisor regarding the deductibility of interest and charges under the Account.

*(THIS SPACE INTENTIONALLY LEFT BLANK)*

## NOTICE TO BORROWER

You have the right to be represented by an attorney of your own choosing at the time this Agreement is signed.

Read the entire Agreement before you sign.

You are entitled to a copy of this Agreement.

You may prepay the unpaid balance at any time without penalty and may be entitled to receive a refund of unearned charges in accordance with the law.

Do not sign this Agreement if it contains blank spaces. All spaces should be completed before you sign.

This Loan Agreement is secured by a mortgage on your real property. Default in the payment of this loan may result in loss of the property securing this loan.


Victor Moreno
_____
Borrower Name

*Victor Moreno*
_____
Borrower Signature

765 Warbler Court

Merced, California 95340
_____
Address

February 22, 2006
_____
Date

\* \* \* \*

_____
Borrower Name

_____
Borrower Signature

_____
Address

February 22, 2006
_____
Date

_____
Borrower Name

_____
Borrower Signature

_____
Address

February 22, 2006
_____
Date

_____
Borrower Name

_____
Borrower Signature

_____
Address

February 22, 2006
_____
Date

PAY TO THE ORDER OF
**GMAC Bank**
WITHOUT RECOURSE
GMAC MORTGAGE CORPORATION

D. CHISO., LIMITED SIGNING OFFICER

PAY TO THE ORDER OF
Cadles of Grassy Meadows II, L.L.C.
WITHOUT RECOURSE
GMAC MORTGAGE CORPORATION

D. CHISO., LIMITED SIGNING OFFICER

Pay to the Order of
GMAC Mortgage Corporation
Without Recourse

Joanna Wight, Vice President
Acting Agent for GMAC Bank

# ALLONGE

Reference is made to that certain Note, dated February 22, 2006, made by Victor Moreno. In the original principal amount of $40,000.00. It is intended that this Allonge be attached to the Note.

**HERITAGE PACIFIC FINANCIAL, LLC d/b/a HERITAGE PACIFIC FINANCIAL**

Pay to the order of _____, without recourse.

Executed this 2nd day of March, 2010.

CADLES OF GRASSY MEADOWS II, L.L.C.

By: The Cadle Company, Manager

By: _____
Timothy F. Dugic
Its: Assistant Vice President

File Name: Victor Moreno
Our File No. ▇▇▇0903
Asset No. ▇▇▇8248